**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Linda Moynihan, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Thermos, L.L.C.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Linda Moynihan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Thermos, L.L.C. ("Thermos" or "Defendant") and alleges the following based on personal knowledge as to herself, and as to all other matters upon information and belief, including the investigation conducted by her attorneys:

**NATURE OF THE ACTION**

1. This is a proposed class action arising from a dangerous design defect in certain Thermos-branded vacuum-insulated food jars and beverage bottles (the "Products"), including the Thermos Stainless King Food Jars (Model Nos. SK3000 and SK3020) and the Thermos Sportsman Food & Beverage Bottles (Model No. 3010). Defendant designed, marketed, distributed, and sold the Products with a stopper that lacks an adequate pressure-relief mechanism, permitting internal pressure to build during ordinary and foreseeable use and causing the stopper to forcefully eject when the container is opened (the "Defect"), posing a serious risk of impact injuries, lacerations, and eye injuries to consumers.

1

2. On April 30, 2026, the United States Consumer Product Safety Commission ("CPSC"), together with Thermos, announced a recall (the "Recall" or "Recall Notice") of approximately 8.2 million Products—approximately 5.8 million Stainless King Food Jars and approximately 2.3 million Sportsman Food & Beverage Bottles—sold at major retailers nationwide, including Amazon, Target, and Walmart, and through Thermos.com, from approximately March 2008 through July 2024 for approximately $30 per unit.[1]

3. As of the Recall Notice, Defendant had received at least **27 reports** of incidents in which the stopper forcefully ejected from a Product and struck a consumer, including injuries requiring medical attention and reports of permanent vision loss.

4. Per the Recall Notice, Defendant offered only a single remedy: a free replacement lid. No cash refund—partial or otherwise—is available, even though Defendant priced these Products at a substantial premium based on representations of durability, safety, and suitability for everyday consumer use. Moreover, Defendant tucked its Recall Notice away in a remote corner of its website that few consumers are likely to encounter.[2]

5. The Recall is inadequate because it fails to offer any monetary relief whatsoever to Plaintiff and Class Members who purchased the defective Products. Instead of providing a proper remedy, Thermos merely directs consumers to obtain a replacement lid—a remedy that imposes burdens of identification, contact, and delay on consumers, does not compensate purchasers for the diminished value of the Products at the time of purchase or diminished use while the consumers await a replacement lid, does not provide for incidental costs, and presumes—without basis—that all affected units will be inspected, brought in, or refitted.

---

[1] *See* CPSC Recall No. 26-444, Thermos Recalls 8.2 Million Stainless King Food Jars and Bottles Due to Serious Impact Injury and Laceration Hazards (Apr. 30, 2026).
[2] *See* Product Recalls, THERMOS, https://thermos.com/pages/product-recalls.

6. Moreover, the Recall is also inadequate because it was announced far too late, and requires consumers to shoulder the administrative burden of returning the Products to a safe and usable state. The CPSC's own published research confirms that consumer product recall response rates drop significantly when consumers face cognitive or task overload, or when the recall fails to offer sufficient incentives to participate.[3] As a result, consumers who have already discarded the Products because of the Defect, who no longer trust the Products, or who are not reached by the Recall Notice are left without any recourse.

7. Defendant knew, or should have known, of the Defect prior to the Recall. Publicly available consumer complaints—including incident reports submitted to the CPSC's SaferProducts.gov portal—described forceful stopper-ejection events well before April 30, 2026. As designer and manufacturer of the Products, Defendant also had access to internal pre-market design data, post-sale incident reports, warranty claims, and consumer complaints from which it knew, or should have known, that the Products contained the Defect. Nevertheless, even after these events, Defendant continued to market and sell the Products under claims of safety, durability, and suitability for storing hot or perishable contents, and continued to profit from sales until the Recall.

8. Thermos is one of the most recognized brands in vacuum-insulated drinkware in the United States and globally, leveraging more than a century of brand recognition and consumer trust. Thermos's marketing emphasizes "double-wall vacuum insulation," "18/8 stainless steel," and a "Dura-Guard pressure relief stopper that enhances insulated performance and removes easily." These representations are misleading by omission because they fail to

---

[3] *See* RECALL EFFECTIVENESS RESEARCH: A REVIEW AND SUMMARY OF THE LITERATURE ON CONSUMER MOTIVATION AND BEHAVIOR, CPSC, at 25 (July 2003).

disclose that the stopper lacks an adequate pressure-relief mechanism and can forcefully eject when internal pressure builds during normal and foreseeable use.

9. Defendant was able to charge premium prices for the Products through these marketing efforts and by withholding from consumers the existence of the Defect. Defendant knew, or should have known, that consumers prioritize safety and reliability, and would find the risks of injury (particularly any impact, laceration, or eye-injury hazard associated with a product designed to be opened in close proximity to the user's face and hands) material to the purchase of those products. Nevertheless, Defendant failed to disclose the associated risks.

10. The Defect existed at the point of purchase. Plaintiff and Class Members reasonably believed the Products were safe for their intended use and paid a premium based on that assurance.

11. Despite the Recall, the Defect remains, leaving the Products unsafe, unfit for use, and worth substantially less than represented or warranted. The replacement lid is not a redesign that fully eliminates the pressurization hazard; it is, at best, a marginal mitigation. For example, Defendant has not demonstrated in the Recall Notice that the replacement eliminates the risk that internal pressure could build and cause the stopper to forcefully eject.

12. No reasonable consumer would have purchased the Products on the same terms or for the same price had they known of the Defect. Defendant chose to disregard its knowledge of the defect, and continued to expose consumers to danger in order to maximize sales. Despite finally acknowledging the Defect, Defendant has still failed to provide consumers, including Plaintiff and Class Members, with a meaningful economic remedy.

13. Had Plaintiff and Class Members known about the Defect, they would not have purchased the Products or would have paid less for them.

14. Plaintiff, on behalf of herself and the Class, seeks damages and all other relief available at law and in equity, including punitive damages for Thermos's misconduct. Plaintiff also seeks classwide injunctive relief, including: (i) a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products; (ii) the implementation of a corrective-advertising campaign to alert consumers to the dangers of the Defect; (iii) an offer to replace the Products with a reasonable and safe product; and/or (iv) a full refund of the purchase price.

15. This action seeks to hold Defendant accountable for its conscious decision to manufacture and sell a dangerous Product, conceal the known hazard, and implement an insufficient recall remedy.

**PARTIES**

*Plaintiff Linda Moynihan*

16. At all relevant times, Plaintiff Linda Moynihan is and was a resident and citizen of Wappingers Falls, New York, who purchased a recalled Product. Plaintiff was unaware of the serious safety hazard associated with the Product's design. In or around December of 2023, Plaintiff purchased a red, 24-ounce Thermos Stainless King Food Jar bearing Model No. SK3020 from Amazon for approximately $32.99.

17. At the point of purchase, Plaintiff read and reasonably relied on Defendant's representations that the Product was safe for everyday consumer use, including for storing and consuming hot foods and beverages.

18. Plaintiff used the Product as instructed for its intended food-storage purposes.

19. Plaintiff would not have purchased or used the Product if she had known about the Defect and that the Product was unsafe to use.

*Defendant Thermos, L.L.C.*

20.     Defendant Thermos, L.L.C. is a Delaware limited liability company with its principal place of business at 475 N. Martingale Road, Suite 1100, Schaumburg, Illinois 60173. Upon information and belief, Defendant or its subsidiaries are engaged in the design, manufacture, marketing, sale, and distribution of the recalled Products throughout the United States. Upon information and belief, the members of Defendant's LLC reside in Illinois.

21.     Upon information and belief, Defendant—either directly or through third-party entities—designed, manufactured, distributed, marketed, advertised, and sold the recalled Products in all fifty states, including through major retailers such as Amazon, Target, and Walmart, and through its own website at https://thermos.com.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act because: (1) there are 100 or more putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) at least one Class Member is a citizen of a State different from the State of which Defendant is a citizen.

23.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in Schaumburg, Illinois, rendering it "at home" in this State and District, and because Defendant does substantial business in this State and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of products in this District, has engaged in the unlawful practices described in this Complaint within this District, and because, upon information and belief, the members of Defendant's LLC reside here.

24.     Under 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this District, because Defendant resides in this District for purposes of 28 U.S.C. § 1391(c)(2), and because Defendant has intentionally availed itself of the laws and markets within this District.

## COMMON FACTUAL ALLEGATIONS

**I. Thermos Knew, or Should Have Known, of the Defect.**

25.     On April 30, 2026, the CPSC announced a nationwide recall of the affected Thermos Products—approximately 8.2 million units sold in the United States. The Recall covers Products sold between approximately March 2008 and July 2024 through major retailers, including Amazon, Target, and Walmart, and through Thermos.com.

26.     Thermos received at least 27 reports of incidents in which the stopper of a Product forcefully ejected upon opening and struck a consumer, including injuries requiring medical attention and three reports of permanent vision loss.

27.     The Defect existed throughout the span of the Products' availability. Thermos had access to pre-market design and testing data, post-sale incident reports, consumer complaints, warranty claims, and product reviews, as further demonstrated by the public CPSC and Thermos recall announcements.

28.     By way of example, an incident report submitted to SaferProducts.gov on or about April 12, 2024—approximately two years before the Recall—described a Thermos Stainless King 16-ounce vacuum-insulated food jar "explosively decompressing" upon opening, producing a loud bang and propelling the lid across a kitchen with sufficient force to ricochet off

a countertop and travel an additional 8–10 feet before coming to rest.[4] Although that consumer reported no physical injury, the report underscores the severity and unpredictability of the Defect, including the risk of serious impact injuries, lacerations, and eye injuries, and demonstrates that Thermos was on notice of the dangerous pressure buildup and forceful lid ejection well before the Recall.

29.     On information and belief, Thermos did not issue any proactive safety alert to consumers, did not modify the design of the Products, and did not limit sales of older units prior to the CPSC's announcement of the Recall.

30.     The CPSC recall remedy consists of consumers contacting Thermos to obtain a free replacement lid. But this "remedy" requires affirmative consumer action, and imposes an unnecessary, asymmetrical burden on consumers by forcing them to identify their Product, contact Thermos, await delivery of the replacement lid, and install it, all without economic recompense.

31.     The known risk of impact injury, laceration, and eye injury due to the Defect, Thermos's dominant position in the vacuum-insulated drinkware market, and the likelihood that a substantial portion of defective Products remain in consumer hands all support Plaintiff's allegations that Thermos acted with knowledge of the Defect yet still represented, marketed, distributed, and sold unsafe Products.

32.     Contrary to Defendant's representations to reasonable consumers promising safety and durability, Defendant chose to ignore the serious safety hazards presented by the uniform Defect present in each Product and industry guidance and recommendations. In doing so,

---

[4] *See* SaferProducts.gov Incident Report ID 4692794, *available at* https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4692794.

Defendant revealed that it is most concerned with its own profits—not consumers and their safety.

33. As the designer and manufacturer of the Products, Defendant had access to design specifications, pre-market safety testing, post-sale incident data, and consumer complaints from which it knew, or should have known, that the Products contained the Defect.

34. Nevertheless, Defendant took no action to eliminate the Defect or, at the very least, adequately warn consumers of the Defect.

35. Accordingly, Defendant had a duty to investigate and disclose all safety hazards regarding the Products, including the Defect.

36. As a direct result of Defendant's conduct, Plaintiff and the proposed Class Members suffered economic losses by purchasing the Products at a price premium. Had Plaintiff and Class Members known the truth about Defendant's defective Products, they would not have purchased them or would have paid less for them.

**II. The Recall Was Untimely and Inadequate.**

37. On April 30, 2026, the CPSC announced a voluntary nationwide recall of approximately 8.2 million Products sold by Thermos in the United States, all of which contain the same Defect—namely, a stopper that lacks an adequate pressure-relief mechanism and that may forcefully eject when the Product is opened after internal pressure has built up.

38. The Recall, however, is both inadequate and deficient: there is unreasonable delay in notifying consumers, and the offered remedy does not compensate consumers for the diminution in value and the price premium paid for the defective Products. Despite the Defect rendering the Products unsafe and unfit for their intended use, the Products continued to be sold

9

for years after consumer incident reports about pressurized stopper ejection became publicly available.

39.     Despite having the capability and expertise to mitigate the risk, Thermos failed to redesign the Product or issue sufficient consumer warnings. This delay contributed to the continued availability of defective Products. Nevertheless, Thermos prioritized profit over the integrity and safety of the Products and continued pushing the Products into the marketplace with the Defect.

40.     In addition, the Recall and its remedy are inadequate because Thermos merely instructed consumers to contact the company for a free replacement lid. Thermos did not offer a refund. This replacement option is only available to consumers who still have the Product in their possession; consumers who have already discarded the Product because of the Defect are left entirely without recourse, having already paid a price premium for a defective Product. Even those consumers who do request a replacement lid cannot use the Product during the request-and-shipment period and have no guarantee that the replacement lid eliminates the pressurization risk.

41.     The CPSC has maintained since at least 2003 that consumer product recall response rates drop significantly when consumers face cognitive or task overload, or when the recall fails to provide sufficient incentives to participate.

42.     Thermos deliberately chose the most profitable approach to its business and the least harmful to its brand image, rather than a solution that would ensure the safety and reliability of its Products.

### III. The Failure of Essential Purpose of the Warranties.

43. Thermos expressly warranted, through its product packaging, owner's manuals, online product pages, and other advertising, that the Products were fit for their ordinary and intended use, including the storage and consumption of hot foods and beverages.

44. The Products are also covered by the implied warranty of merchantability, which ensures that goods sold by a merchant are fit for the ordinary purposes for which such goods are used.

45. Thermos clearly intended its warranties to benefit consumers who rely on the company for safe, durable insulated drinkware.

46. Despite these warranties, the Products contain a uniform Defect that existed before and at the time of sale, causing them to fail in their fundamental purpose.

47. Thermos knew, or should have known, about the Defect and the dangers it posed before and at the time the Products were sold.

48. Plaintiff and Class Members, by contrast, had no way of discovering the Defect or the risks associated with it prior to purchase. The pressurization phenomenon at the core of the Defect occurs invisibly inside a sealed container and manifests only when the consumer attempts to open the container.

49. Thermos was in a far superior position to identify, address, and disclose the Defect, whereas Plaintiff and Class Members had no ability to detect it at the time of purchase.

50. This disparity in bargaining power prevented Plaintiff and Class Members from receiving the benefit of the warranties.

51. The inequity was compounded by the fact that Thermos knew, or should have known, of the Defect, while Plaintiff and Class Members had no notice of it and no reason to

suspect it, given Thermos's marketing of the Products as safe, durable, and suitable for everyday consumer use.

52. Thermos abused the trust it fostered with consumers by promoting, designing, manufacturing, and selling the Products as safe and durable, leaving Plaintiff and Class Members with no meaningful choice but to rely on Thermos's representations and accept its warranty terms.

53. Thermos knew Plaintiff and Class Members lacked the ability to detect the Defect and that they would ultimately bear the cost of the inadequate replacement remedy.

54. Because the Products were defective when they left the assembly line, Thermos was already in breach of its warranties when Plaintiff and Class Members purchased the Products.

55. Thermos sold the Products knowing they could not be repaired or replaced with a non-defective Product, as the replacement lid is, at best, a marginal mitigation that does not eliminate the underlying pressurization hazard.

56. Had Plaintiff and Class Members known of the Defect, they would have negotiated different terms, including a lower price to account for the risk of injury, or declined to purchase the Products altogether.

57. Thermos sold the Products with full knowledge that they did not conform to its safety-based marketing claims and were not safe or suitable for their intended and foreseeable use.

58. The terms of the express warranties unreasonably favor Thermos at the expense of Plaintiff and Class Members.

59. The warranties failed in their essential purpose because (1) the Defect existed when the Products left the manufacturing facility, and (2) Thermos failed to disclose the Defect at any point, including when contacted by customers regarding the Products.

60. Accordingly, Plaintiff and Class Members are not limited to the remedies stated in the express warranties and seek all remedies that this Court finds just, proper, and permissible.

**IV. Thermos's Actual or Constructive Knowledge of the Defect and Duty to Disclose.**

61. Defendant's knowledge of the Defect is evidenced by, among other things, the Recall Notice, the public CPSC announcement, the 27 reports of incidents (including reports of **permanent vision loss**), and consumer complaints publicly available on platforms including SaferProducts.gov.

62. Thus, at all relevant times, Defendant indisputably possessed continuous knowledge of the material dangers posed by the Products, and yet Defendant knowingly continued to allow the sale of the Products. Plaintiff's and other Class Members' claims are not time-barred.

63. Moreover, Defendant is unable to prove that the Recall Notice reached all Product owners.

64. Plaintiff and other Class Members could not have reasonably discovered, and could not have known, facts that would have caused a reasonable person to suspect that Defendant knowingly failed to disclose material information within its knowledge about a dangerous defect to consumers in the United States. Therefore, no potentially relevant statute of limitations should apply.

65. Throughout the time period relevant to this action, Defendant concealed from and failed to disclose to Plaintiff and the other Class Members vital information about the Defect described herein.

66. Defendant kept Plaintiff and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

67. Defendant had a duty to disclose to Plaintiff and the Class Members the true quality and nature of the Products, that the Products contain a uniform dangerous Defect, and that the Defect poses safety concerns and is in fact dangerous.

68. Instead, Defendant continued to market the Products as suitable for their intended purpose to further profit from sales and prevent Plaintiff and other Class Members from seeking redress.

69. Plaintiff and the other Class Members justifiably relied on Defendant to disclose the true dangerous nature of the Products they purchased, because the Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

70. Defendant's affirmative acts of concealment, including its continued marketing of the defective Products as safe, reliable, and fit for their intended purpose while possessing knowledge of the hazard, further support estoppel and tolling of any applicable limitations period.

## FED. R. CIV. P. 9(b) ALLEGATIONS

71. Although Thermos is in the best position to know information about the design, manufacture, distribution, and sale of the Products as well as the facts surrounding the Defect

during the relevant timeframe, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

72. **WHO:** Thermos made material misrepresentations and/or omissions of fact through its marketing, on its website, product packaging, warranties, owner's manuals, and labeling, through warranty claims, and through authorized retailers of the Products, including statements that the Products were safe, durable, suitable for storing hot or perishable contents, and equipped with a "pressure relief stopper that enhances insulated performance."

73. **WHAT:** Thermos's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products are defective, unsafe, and unsuitable for their intended use in that the Products contain a uniform Defect—namely, a stopper that lacks an adequate pressure-relief mechanism and may forcefully eject when the Product is opened after internal pressure has built up. Thermos's employees and representatives made affirmative misrepresentations regarding the safety, durability, and pressure-relief characteristics of the Products at the time of purchase. Thermos failed to adequately warn Plaintiff and Class Members that the Products contained the Defect, were not suitable for their intended use, and posed a risk of impact injury, laceration, and eye injury. Thermos's conduct had the effect of deceiving Plaintiff and Class Members into believing that the Products were not defective. Thermos knew, or should have known, that the existence of the Defect is material to a reasonable consumer, including Plaintiff and Class Members, and impacts purchasing decisions, and yet Thermos omitted any warning that the Products are defective.

74. **WHEN:** Thermos made material misrepresentations and/or omissions during the putative Class period and at the time Plaintiff and Class Members purchased the Products, prior

to and at the time Plaintiff and Class Members made claims after realizing the Products contained a uniform Defect, and continuously throughout the applicable Class period.

75. **WHERE:** Thermos's marketing message and omissions were uniform and pervasive, carried through material misrepresentations and omissions on the Products' labeling and packaging, on Thermos's website, and on the websites of authorized retailers, including Amazon, Target, and Walmart.

76. **HOW:** Thermos made material misrepresentations of material facts regarding the Products, including, but not limited to, the existence of the uniform Defect as well as the associated risks of impact injury, laceration, and eye injury.

77. **WHY:** Thermos made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay a premium price for the Products, the effect of which was that Thermos profited by selling the Products to many millions of consumers.

78. **INJURY:** Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendant's misrepresentations and omissions.

## CLASS ACTION ALLEGATIONS

79. Plaintiff brings this action on behalf of herself and the following Class and Subclass under Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> **Nationwide Class:** All persons in the United States who purchased the Products for personal or household use, and not for resale, during the fullest period allowed by law.

**New York Subclass:** All persons who purchased the Products in the State of New York for personal or household use, and not for resale, during the fullest period allowed by law.

80.     Excluded from the Class and Subclass are: (a) any officers, directors, or employees, or immediate family members of the officers, directors, or employees of Defendant or any entity in which Defendant has a controlling interest; (b) any legal counsel or employee of legal counsel for Defendant; (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members; and (d) any person who has previously settled claims related to the Defect with Defendant.

81.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

82.     Plaintiff seeks damages and equitable relief on behalf of herself and the putative Class and Subclass. Plaintiff disclaims any intent or right to seek recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiff and/or putative Class Members.

83.     **Numerosity.** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains currently unknown, upon information and belief, there are millions of putative Class Members because the Recall covers approximately 8.2 million Products. Moreover, the number of Class Members may be ascertained from Defendant's books and records, as well as from third-party retailers. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

17

84.     **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist for all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

- Whether the Products contained the Defect alleged herein;

- Whether the stopper design of the Products, including the absence of an adequate pressure-relief mechanism, posed an unreasonable risk of sudden and forceful ejection under normal and foreseeable use;

- Whether Defendant knew or should have known of the Defect prior to selling the Products;

- Whether Defendant had a duty to disclose the Defect to consumers;

- Whether Defendant's representations and omissions regarding the safety, durability, and pressure-relief characteristics of the Products were misleading or deceptive;

- Whether Defendant's marketing of the Products as safe and suitable for storing hot or perishable contents was reasonably likely to deceive a reasonable consumer;

- Whether the Recall and its remedy demonstrate a feasible safer alternative design;

- Whether the Recall and replacement-lid remedy are inadequate to compensate Plaintiff and Class Members;

- Whether Defendant violated the consumer protection laws alleged herein;

- Whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members;

- Whether Defendant breached the implied warranty of merchantability;

- Whether Plaintiff and Class Members suffered economic injury; and

- Whether Plaintiff and Class Members are entitled to damages—including compensatory, statutory, and punitive damages—and the nature of such damages, and/or to declaratory, injunctive, or other equitable relief.

85.     **Typicality.** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Products, and each sustained economic damages arising from Defendant's wrongful conduct, as alleged herein. Plaintiff shares the aforementioned facts and legal claims with the putative Class Members. Plaintiff and all members of the putative Class have been similarly affected by Defendant's common misconduct alleged herein, including—but not limited to—ascertainable losses resulting from Defendant's deceptive omissions concerning the Products' safety, as well as the proposed replacement-lid remedy's inability to make purchasers whole.

86.     **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Class and Subclass. Plaintiff has retained counsel with substantial experience in handling complex class-action litigation, including the complex questions that arise in this type of consumer-protection litigation. Plaintiff and counsel are committed to the vigorous prosecution of this action. Plaintiff has no conflicts of interest or interests adverse to those of the putative Class.

87.     **Insufficiency of Separate Actions.** Absent a class action, Plaintiff and members of the Class and Subclass will continue to suffer the harm described herein, for which they would have no remedy. Even if individual consumers could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be

dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

88. **Superiority.** A class action is superior to any other available method for the fair and efficient adjudication of the present controversy for at least the following reasons:

    a. The damages suffered by each individual member of the putative Class do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

    b. Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

    c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Class;

    d. Individual joinder of all members of the Class is impracticable;

    e. Absent a class action, Plaintiff and members of the putative Class will continue to suffer harm as a result of Defendant's unlawful conduct; and

    f. This action presents no manageability concerns that would impede its treatment as a class action and, in fact, is the most appropriate and efficient method by which Plaintiff and the members of the putative Class can obtain redress for the harm caused by Defendant's misconduct.

89. In the alternative, the Class may be certified for the following reasons: (a) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications concerning individual members of the Class, which would establish incompatible standards of conduct for Defendant; and (b) adjudications of the claims

of individual members of the Class against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Class who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests.

90.     Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**Violation of the New York Deceptive Acts and Practices Law**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of Plaintiff Linda Moynihan, individually, and the New York Subclass)**

91.     Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

92.     New York General Business Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

93.     Defendant's conduct alleged herein constitutes recurring, unlawful, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349.

94.     Defendant misleadingly, inaccurately, and deceptively advertises and markets the Products to consumers in New York and across the United States.

95.     Defendant's improper consumer-oriented conduct—including failing to disclose that the Products can build internal pressure during ordinary and foreseeable use and cause the stopper to forcefully eject upon opening—is misleading in a material way in that it, inter alia,

21

induced Plaintiff and the New York Subclass to purchase the Products and to use them when they otherwise would not have. Defendant made these untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

96. Plaintiff and the New York Subclass were injured inasmuch as they purchased Products that were mislabeled and not as represented, and paid a price premium for those Products. Plaintiff and the New York Subclass received less than what they bargained and paid for.

97. Defendant's advertising and the Products' packaging and labeling induced Plaintiff and the New York Subclass to purchase the Products.

98. Defendant's deceptive and misleading practices constitute deceptive acts and practices in the conduct of business in violation of N.Y. Gen. Bus. Law § 349(a), and Plaintiff and the New York Subclass have been damaged thereby.

99. As a result of Defendant's recurring, unlawful, deceptive acts and practices, Plaintiff and the New York Subclass are entitled to monetary, statutory, compensatory, treble, and punitive damages, interest, and attorneys' fees and costs.

## COUNT II

**Violation of the New York False Advertising Law**
**N.Y. Gen. Bus. Law § 350**
**(On behalf of Plaintiff Linda Moynihan, individually, and the New York Subclass)**

100. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

101. N.Y. Gen. Bus. Law § 350 provides, in pertinent part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

102. N.Y. Gen. Bus. Law § 350-a(1) defines "false advertising," in pertinent part, as advertising, including labeling, of a commodity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, the statute directs that there shall be taken into account, among other things, the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates.

103. Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning the Products, inasmuch as they misrepresent that the Products are safe for use and fail to disclose that the Products can build internal pressure and cause the stopper to forcefully eject during normal use, exposing users to a risk of impact injury, laceration, and eye injury.

104. Plaintiff and the New York Subclass were injured inasmuch as they saw the labeling, packaging, and advertising and purchased Products that were mislabeled and not as represented. Plaintiff and the New York Subclass received less than what they bargained and paid for.

105. Defendant's advertising, packaging, and labeling induced Plaintiff and the New York Subclass to purchase the Products.

106. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

107. Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

108.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. All consumers who purchased the Products were and continue to be exposed to Defendant's material misrepresentations.

109.    As a result of Defendant's recurring, unlawful, deceptive acts and practices, Plaintiff and the New York Subclass are entitled to monetary, statutory, compensatory, treble, and punitive damages, interest, and attorneys' fees and costs.

## COUNT III

### Unjust Enrichment
### (On behalf of Plaintiff and the Nationwide Class)

110.    Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

111.    Plaintiff and Class Members conferred a benefit on Defendant by purchasing the Products—payments that Defendant knowingly accepted while aware of the Products' Defect and unfitness for their intended use.

112.    Defendant either knew or should have known that the payments rendered by Plaintiff and Class Members were given with the expectation that the Products would have the qualities, characteristics, and suitability for use represented and warranted by Defendant. As such, it would be inequitable for Defendant to retain the benefit of those payments under these circumstances.

113.    By its wrongful acts and omissions described herein, including selling the Products with the Defect and without adequate disclosure of the Defect, Defendant was unjustly enriched at the expense of Plaintiff and putative Class Members.

114. Defendant's wrongful conduct directly caused Plaintiff's detriment and resulted in Defendant's unjust enrichment, as the benefit it received flowed directly from the misconduct alleged in this Complaint.

115. Defendant has unjustly profited from its unlawful, unfair, and deceptive conduct at the expense of Plaintiff and the putative Class Members. It would be inequitable and contrary to principles of justice for Defendant to retain the profits, benefits, and other compensation obtained through the sale of the Products, as such enrichment was directly tied to the misconduct alleged herein.

116. Defendant was unjustly enriched by retaining revenues from Class Members' purchases of the Products. Such enrichment is unjust and inequitable because Defendant knowingly manufactured, marketed, and sold the defective and dangerous Products while omitting material facts, causing Plaintiff and Class Members to purchase Products they otherwise would not have bought had the truth been disclosed.

117. Defendant continued to sell the Products with their inherent Defect even after consumer complaints about pressurized lid ejection became publicly available, including via the CPSC's SaferProducts.gov database. Even after these reported incidents, Defendant continued to tout the safety and durability of its Products, considerably profiting throughout the sales period.

118. Under common-law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments. Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayment.

## COUNT IV

### Negligent Design
### (On behalf of Plaintiff and the Nationwide Class)

119.    Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

120.    Defendant had a duty to exercise reasonable care in the design of the Products to avoid unreasonable, foreseeable risks of harm where safer, feasible alternatives existed.

121.    The Products are designed to store hot and perishable contents in a sealed container, which foreseeably leads to internal pressure buildup over time. In ordinary use, consumers open the container by removing the stopper, placing their face and hands in close proximity to the opening, thereby positioning themselves directly within the zone of danger because the design does not safely regulate or release internal pressure prior to opening.

122.    Feasible, safer alternative designs were available at reasonable cost, including, without limitation: (a) incorporation of an effective pressure-relief mechanism within the stopper; (b) a venting system to safely release internal pressure prior to opening; (c) stopper designs that prevent forceful ejection under pressurized conditions; (d) improved sealing components that maintain integrity without creating dangerous pressure buildup; and (e) clear and adequate warning labels regarding the risk of pressure accumulation and sudden ejection.

123.    Defendant breached its duty by adopting and selling the defective design without proper safeguards.

124.    This defective design was a substantial factor in causing the harm alleged by Plaintiff and the putative Class Members, including dangerous stopper-ejection events and economic loss during ordinary and foreseeable use.

125.    Defendant had actual and constructive knowledge of the Defect well before the Recall announcement, including through consumer complaints, internal testing, and incident data

26

accumulated over years. Defendant continued to market and sell the Products without adequate warning or redesign.

126. Plaintiff and the Class suffered injury and damages, including economic losses, proximately caused by Defendant's negligent design.

## COUNT V

### Negligent Failure to Warn
### (On behalf of Plaintiff and the Nationwide Class)

127. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

128. Defendant owed a duty to provide adequate warnings and instructions regarding non-obvious risks known or reasonably knowable at the time of sale, and, when appropriate, to provide post-sale warnings as knowledge of hazards emerged.

129. The risk that internal pressure could build within the Products during ordinary and foreseeable use and cause the stopper to suddenly and forcefully eject upon opening was not open and obvious to ordinary consumers at the time of purchase. Consumers would not reasonably expect that storing hot or perishable contents in a sealed container could create sufficient internal pressure to cause the stopper to eject with force and cause injury.

130. Defendant knew or, in the exercise of reasonable care, should have known of this hazard through pre-market design and testing, as well as post-sale consumer complaints, product reviews, and incident reports. Defendant has acknowledged at least 27 incidents involving forceful stopper ejection, including injuries requiring medical attention and three instances of permanent vision loss, yet failed to timely provide adequate warnings, instructions, or interim safety guidance prior to issuing the Recall.

131. Defendant breached its duties by: (a) omitting clear pre-sale warnings regarding the risk of pressure buildup and sudden stopper ejection; (b) failing to provide adequate instructions on how to safely open the container or mitigate internal pressure prior to removing the stopper; and (c) failing, post-sale, to promptly warn consumers or provide interim safety measures, such as revised instructions, warnings, or replacement components, once the hazard became known.

132. The absence of adequate warnings and instructions was a substantial factor in causing Plaintiff and Class Members to purchase Products they would not have purchased, or would have paid less for, had the risk been disclosed.

## COUNT VI

### Negligence
### (On behalf of Plaintiff and the Nationwide Class)

133. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

134. Defendant owed Plaintiff and the Class a duty to exercise reasonable care in the design, testing, manufacture, instructions, and warnings for the Products, including a post-sale duty to take reasonable steps once hazards became known.

135. Defendant breached these duties by, among other things: (a) designing and selling the Products with a stopper that lacks an adequate pressure-relief mechanism, thereby permitting dangerous internal pressure buildup; (b) failing to conduct or act upon reasonable pre-market testing regarding pressure accumulation and stopper-ejection risks; (c) failing to provide adequate pre-sale warnings and instructions regarding the risk of pressure buildup and safe opening of the container; and (d) failing, post-sale, to timely warn prior purchasers, issue corrective instructions, or implement a prompt repair or replacement program after receiving consumer complaints, incident reports, and injury data.

136. The risks of internal pressure buildup and sudden, forceful stopper ejection were foreseeable to Defendant, and safer, feasible alternative designs and precautions were available at reasonable cost, including incorporation of an effective pressure-relief mechanism, controlled venting systems, stopper designs that prevent ejection under pressure, and clear, prominent warnings and instructions regarding safe use.

137. Defendant's negligence was a substantial factor in causing the economic injuries suffered by Plaintiff and the Class during ordinary and intended use. Such harm was a reasonably foreseeable consequence of the breaches alleged.

138. As a direct and proximate result, Plaintiff and the Class sustained damages, including overpayment, out-of-pocket losses, and diminution in value. Plaintiff and Class Members primarily seek recovery for economic losses independent of any personal-injury claims.

## COUNT VII

**Breach of Implied Warranty of Merchantability**
**U.C.C. § 2-314**
**(On behalf of Plaintiff and the Nationwide Class)**

139. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

140. Defendant is a merchant that designed, manufactured, marketed, and sold the Products for the ordinary purposes of storing and consuming food and beverages.

141. An implied warranty arose that the Products were fit for the ordinary purposes for which such goods are used, including the safe storage and consumption of hot and perishable contents during normal and foreseeable use.

142. The Products were not merchantable at the time of sale because they were defectively designed with a stopper lacking an adequate pressure-relief mechanism, which

allows internal pressure to build when food or beverages are stored for extended periods. As a result, the stopper can suddenly and forcefully eject upon opening, exposing users to a significant risk of impact injuries, lacerations, and eye injuries during ordinary and foreseeable use.

143.    Defendant knew or should have known of this hazard through pre-market testing and post-sale complaints and reviews, yet continued sales without an adequate design fix or effective warnings.

144.    Plaintiff and Class Members purchased the Products from Defendant or its authorized retailers. To the extent privity is required, it is satisfied by purchases through Defendant's retail channels and/or because purchasers were intended third-party beneficiaries of Defendant's warranties.

145.    Any purported warranty disclaimer or limitation is unenforceable because it was not conspicuous, is unconscionable given the undisclosed safety defect, and in all events any limited remedy failed of its essential purpose.

146.    Defendant had actual notice from consumer complaints and injury reports, including incident reports submitted to SaferProducts.gov, as well as from the pre-suit notice provided by Plaintiff through this Complaint.

147.    Defendant's breach was a proximate cause of injuries and damages, including economic damages, overpayment, out-of-pocket costs, and diminution in value.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class and Subclass, respectfully prays for relief and judgment against Defendant as follows:

a. Declaring that this action is a proper class action, certifying the Class and Subclass as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

b. Awarding Plaintiff, the Class, and the Subclass compensatory, statutory, actual, and/or monetary damages, including interest, in an amount to be determined at trial;

c. Ordering Defendant to disgorge, for the benefit of the Class and Subclass, all or part of the ill-gotten profits Defendant received from the sale of the Products;

d. Ordering Defendant to implement a court-supervised repair, replacement, and corrective-notice program for all Products, including provision of full refunds for Plaintiff and Class Members who request them;

e. Ordering corrective advertising and disclosure statements at points of sale and on Defendant's website;

f. Granting restitution and disgorgement of monies received from Class Members as a result of the defective and misrepresented Products;

g. Granting declaratory and equitable relief, including restitution and disgorgement;

h. Enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

i. Awarding Plaintiff, the Class, and the Subclass the costs of prosecuting this action, including expert-witness fees;

j. Awarding Plaintiff, the Class, and the Subclass reasonable attorneys' fees and costs as allowable by law;

k. Awarding pre-judgment and post-judgment interest;

l.  Awarding punitive damages where permitted by law for Defendant's willful and reckless disregard of the safety of consumers despite its knowledge of the Defect; and

m.  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, individually and on behalf of the proposed Class and Subclass, hereby demands a trial by jury for all issues so triable.

Dated: May 26, 2026                                Respectfully submitted,

*/s/ Kevin Laukaitis*
Kevin Laukaitis
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 599-6072
klaukaitis@laukaitislaw.com

Andreas E. Moffett*
Of Counsel
**LAUKAITIS LAW LLC**
amoffett@laukaitislaw.com

Mason A. Barney*
Leslie Pescia*
**SIRI & GLIMSTAD LLP**
745 Fifth Ave., Suite 500
New York, NY 10151
T: (212) 532-1091
mbarney@sirillp.com
lpescia@sirillp.com

*Pro Hac Vice admission forthcoming*
*Attorneys for Plaintiff and the Putative Class*